FILED

2021 Oct-20  AM 08:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

|  |  |  |
|---|---|---|
| **STACEY VENABLE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | Civil Action Number |
| | ) | **4:20-CV-1741-AKK** |
| **KILOLO KIJAKAZI, Acting** | ) | |
| **Commissioner of the Social Security** | ) | |
| **Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

Stacey Venable brings this action under 42 U.S.C. § 405(g) of the Social Security Act seeking review of the final adverse decision of the Acting Commissioner of the Social Security Administration. Doc. 1. In essence, Venable argues that the ALJ's decision, which has become the final decision of the Acting Social Security Commissioner, was not based on substantial evidence because the ALJ improperly discredited a doctor's evaluation of Venable's conditions and failed to include the full extent of Venable's limitations in her questions to the vocational expert at the hearing. *See* doc. 15 at 16–17. After a careful review, the court must reverse the ALJ's decision because the ALJ failed to explain why she rejected Venable's contention that she could not afford treatment during the gaps in treatment on which the ALJ relied in discounting Venable's testimony about her limitations.

## I.

Venable formerly held positions as a hatchery line worker, housekeeper, and cook before losing some or most of the mobility in her fingers, hands, and arms. Doc. 15 at 1; R. 52–53.  Venable filed for disability and disability insurance benefits and supplemental security income, alleging a disability onset of June 23, 2018 based on arthritis, diabetes, nerve damage, and other conditions.  Doc. 15 at 1–2; R. 24. After Venable's claims were denied, an ALJ held a hearing with Venable, her attorney, and a vocational expert.  Doc. 15 at 1; R. 40.  The ALJ found that Venable was not disabled.  R. 19, 36.  Thereafter, the SSA Appeals Council denied Venable's request for review, rendering the ALJ's decision the final decision of the Acting Commissioner.  R. 1.  Venable subsequently filed this petition for review.  Doc. 1.

## II.

The court reviews only whether (1) the record contains substantial evidence to sustain the ALJ's decision and (2) the ALJ applied the correct legal standards. *See* 42 U.S.C. § 405(g); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).

Under 42 U.S.C. §§ 405(g) and 1383(c), the Commissioner's factual findings are conclusive if they are supported by "substantial evidence."  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  Substantial evidence refers to "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.*; *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  The threshold for

this evidentiary sufficiency "is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Rather, substantial evidence falls somewhere between a "scintilla" and a "preponderance of evidence." *Martin*, 894 F.2d at 1529; *Moore*, 405 F.3d at 1211. If substantial evidence supports the Commissioner's factual findings, then the court must affirm, even if the evidence preponderates against those findings. *See id.*; *Noble v. Comm'r of Soc. Sec.*, 963 F.3d 1317, 1323 (11th Cir. 2020).

When determining whether substantial evidence supports the Commissioner's decision, the court cannot decide the facts anew, reweigh the evidence, or substitute its judgment for the Commissioner's. *Noble*, 963 F.3d at 1323; *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Despite this limited scope of review, however, the court must not automatically affirm the decision of the Commissioner. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Bloodsworth*, 703 F.2d at 1239. The court "retain[s] an important duty to 'scrutinize the record as a whole' and determine whether the agency's decision was reasonable." *Simon v. Comm'r of Soc. Sec.*, 7 F.4th 1094, 1104 (11th Cir. 2021) (quoting *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)). Courts review de novo the legal conclusions upon which the Commissioner's decision is based. *Id.* at 1103; *Moore*, 405 F.3d at 1211.

## III.

To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable

3

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A); 416(i)(1).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3).

Determinations of disability require a five-step analysis in which the ALJ determines, in order:

(1) whether the claimant is currently unemployed;
(2) whether the claimant has a severe impairment;
(3) whether the impairment meets or equals one listed by the Commissioner;
(4) whether the claimant is unable to perform his or her past work; and
(5) whether the claimant is unable to perform any work in the national economy.

20 C.F.R. § 404.1520(a); *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). "An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of 'not disabled.'" *McDaniel*, 800 F.2d at 1030 (citing 20 C.F.R. § 416.920(a)-(f)).[1]  If the claimant

---

[1] If a claimant's impairments do not meet or equal a listed impairment, as determined at Step Three, the ALJ determines the claimant's "residual function capacity" on the basis of "all of the relevant medical and other evidence" in the claimant's case record.  20 C.F.R. § 404.1520(e).  *See also* 20 C.F.R. § 404.1545(a)(1) ("Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is the most you can still do despite your limitations.").  The ALJ uses the

cannot return to prior work, the Commissioner bears the burden of showing other work the claimant can do. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).

Relevant here is 20 C.F.R. § 404.1520c, which states, for claims filed on or after March 27, 2017,[2] the ALJ will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a).[3] To determine whether a medical opinion or prior administrative medical finding is "persuasive," the ALJ must focus on factors

---

residual function capacity at Step Four to determine if the claimant can perform past relevant work and at Step Five to determine if the claimant can adjust to other work. 20 C.F.R. § 404.1520(e).

[2] For claims filed prior to this date, the SSA regulations require the ALJ to give a treating physician's medical opinion "controlling weight," subject to certain parameters. *See* 20 C.F.R. § 404.1527(c). *See also Simon*, 7 F.4th at 1104 n.4 ("Claims filed after [March 27, 2017] are governed by a new regulation prescribing a somewhat different framework for evaluating medical opinions. Because Simon filed his claim in March of 2015, we need not and do not consider how the new regulation bears upon our precedents requiring an ALJ to give substantial or considerable weight to a treating physician's opinions absent good cause to do otherwise.") (citing 20 C.F.R. § 404.1520c).

[3] New regulations, also amended on March 27, 2017, recategorized the types of evidence a claimant may provide. *See* 20 C.F.R. § 404.1513(a). Objective medical evidence is "medical signs, laboratory findings, or both," while a medical opinion is "a statement from a medical source about what [a claimant] can still do despite [his or her] impairment(s) and whether [a claimant has] one or more impairment-related limitations or restrictions." *Id.* These types of evidence stand apart from "other medical evidence," which includes judgments about the nature and severity of a claimant's impairments, a claimant's medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis. *Id.*

that include supportability,[4] consistency,[5] the medical source's relationship with the claimant,[6] and the medical source's specialization.[7]  *Id.* § 404.1520c(c).  *See also Nix v. Saul*, No. 4:20-CV-00790-RDP, 2021 WL 3089309, at *6 (N.D. Ala. July 22, 2021).  The most important of these factors are supportability and consistency, and the ALJ must articulate how persuasive he or she finds the medical opinions and prior administrative medical findings in a claimant's record.  *Id.* § 404.1520(a)-(b).

Moreover, when a claimant seeks to establish a disability through her own testimony concerning "pain or other subjective symptoms," courts in the Eleventh Circuit apply a three-part test that requires "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can

---

[4] "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  *Id.* § 404.1520c(c)(1).

[5] "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  *Id.* § 404.1520c(c)(2).

[6] This includes the length of the treatment relationship, the frequency of the examinations, the purpose of the treatment relationship, the extent of the treatment relationship (*e.g.*, the kinds of testing performed), and the examining relationship (*i.e.*, whether the medical source actually examined the claimant or only reviewed the claimant's file).  *Id.* § 404.1520c(c)(3).

[7] "Specialization" refers to whether the medical source has received "advanced education and training to become a specialist," which may render that source's findings more persuasive than findings from a non-specialist.  *Id.* § 404.1520c(c)(4).  In addition, the ALJ may consider evidence showing that a medical source "has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability program's policies and evidentiary requirements."  *Id.* § 404.1520c(c)(5).

reasonably be expected to give rise to the claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the ALJ discredits subjective testimony, the ALJ must "articulate explicit and adequate reasons for doing so," and the failure to articulate the reasons for discrediting subjective testimony "requires, as a matter of law, that the testimony be accepted as true." *Wilson*, 284 F.3d at 1225 (citing *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987); *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1998)). The ALJ need not expressly refer to this test, but the ALJ's decision must "indicate that the standard was applied." *See id.*

Finally, if the record shows the claimant has a "medically determinable impairment that could reasonably be expected to produce her symptoms," the ALJ must assess the "intensity and persistence of the symptoms in determining how they limit the claimant's capacity for work." *Costigan v. Comm'r of Soc. Sec.*, 603 F. App'x 783, 786 (11th Cir. 2015) (citing 20 C.F.R. § 404.1529(c)(1)). The ALJ must consider "all of the record," including the objective medical evidence, the claimant's history, and statements of the claimant and the claimant's doctors, and the ALJ may consider factors like the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; the type, dosage, effectiveness, and side effects of the claimant's medication; and treatments other than medication. *Id.* Last, the ALJ must examine the claimant's symptom-related

testimony in relation to all of the other evidence, considering whether there are any "inconsistencies or conflicts between those statements and the record."  *Id.*

## IV.

In this case, at Step One, the ALJ determined that Venable had not engaged in "substantial gainful activity" since her alleged onset date.  R. 24.  At Step Two, the ALJ found that Venable suffered from severe impairments: rheumatoid arthritis, insulin-dependent diabetes mellitus (type 2), peripheral nerve disease, hypothyroidism, pulmonary nodule, bronchitis, and altered mental status.  *Id.*[8]  The ALJ determined that these impairments "significantly limit[ed] [Venable's] ability to perform basic work activities as required by SSR 85-28."  *Id.*  At Step Three, the ALJ found that Venable did not have impairments that met or medically equaled the severity of any listed impairment.  R. 25.  In making this determination, the ALJ noted that a prior ALJ decision identified Venable's chronic obstructive pulmonary disease ("COPD") as a severe impairment, but the ALJ agreed with a non-examining state agency medical consultant, Dr. Thomas G. Amason, that the evidence did not support COPD or asthma.  *Id.* (citing Ex. B1A, B2A, and B4A).  The ALJ decided

---

[8] The ALJ deemed the following non-severe: hypertension, insomnia, obstructive sleep apnea, hepatic splenomegaly, hepatic steatosis, cholelithiasis, atherosclerosis, bilateral tonsillar enlargement with cervical adenopathy, intertrigo, nicotine dependence, and obesity.  R. 25.  But the ALJ stated that she considered "all of [Venable's] medically determinable impairments, including those that are not severe, when assessing [her] residual function capacity."  *Id.*

8

to "give[] [Venable] the benefit of doubt" by identifying Venable's pulmonary nodule, bronchitis, and "altered mental state" as severe impairments.  R. 24–25.

The ALJ found that Venable had a moderate limitation in understanding, remembering, or applying information but no limitations in interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing herself. R. 25.  The ALJ also determined that Venable did not establish a "serious and persistent" mental disorder.  *Id.*  Proceeding to Venable's residual functional capacity, the ALJ "emphasize[d] that [Venable] did not allege that her ability to work [was] limited by any mental impairment" and noted the absence of evidence related to any mental impairments or mental health or psychiatric treatment.  R. 26–27. However, the ALJ recognized that the prior ALJ decision identified "adjustment disorder" as a severe impairment and that, in a function report, Venable alleged impairments "that could be mental in nature, such as problems with memory, completing tasks, concentration, and handling stress."  R. 27 (citing Ex. B3E).

The ALJ then discussed a November 1, 2018 psychological examination by Dr. Mary Arnold, noting that Dr. Arnold's "only diagnosis was nicotine dependence."  R. 27, 299.  According to the ALJ, Dr. Arnold's evaluation revealed that Venable did not "display overt indicators of restrictive pain," "gestured naturally and moved all of her fingers," "was alert and oriented in all spheres," "understood directions," and "had the skills to manage funds."  *See* R. 27, 296–97.  The ALJ

9

deemed Dr. Arnold's finding persuasive because "[it was] supported by her examination of [Venable] and consistent with the record as a whole." R. 27.

The ALJ next considered a December 13, 2018 psychiatric review by Dr. Robert Estock, a non-examining state agency psychological consultant, who found that Venable had no severe mental impairments. *Id.* (citing Ex. B2A and B4A); R. 112. The ALJ also deemed this opinion persuasive because it was "supported by the evidence considered, including Dr. Arnold's examination of [Venable], and it [was] consistent with the record as a whole." R. 27.

Taking this together with the evidence in the record, the ALJ determined that Venable had the residual functional capacity to "perform light work" subject to certain exceptions. R. 28. The ALJ described these limitations as follows:

> [Venable could] occasionally operate foot controls; she would need to change positions from standing to sitting for 30 minutes after every 30 minutes of standing or walking; she [could] remain on task while sitting or standing; she [could] occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; she [could] never climb ladders, ropes and scaffolds; she [could] occasionally reach overhead; she [could] frequently handle and finger with both upper extremities; she [could] never be exposed to unprotected heights or dangerous machinery; she [could] have occasional exposure to weather, extreme heat, extreme cold, and vibration; and she [could] understand, remember, and carry out simple instructions and make simple work related decisions.

*Id.* The ALJ stated that she considered "all symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as the medical opinions and prior

administrative medical findings in Venable's case. *Id.* (citing 20 C.F.R.
§§ 404.1529, 416.929, 404.1520c, 416.920c; SSR 16-3p).

At this juncture, the ALJ turned to the three-part test for evaluating Venable's
subjective testimony about her pain and other symptoms. *See id.* The ALJ
referenced Venable's 2018 function report, in which Venable reported having
problems with performing personal care (*e.g.*, dressing, bathing), taking her
medicine, preparing her meals, doing household chores, walking, and driving. R. 28
(citing Ex. B3E); R. 247–48. In this report, Venable also stated that she could count
change, pay bills, follow instructions, and get along with others but that she had
issues with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling,
climbing stairs, seeing, remembering, completing tasks, concentrating, and using her
hands. R. 29, 247–50. Venable noted that she used a non-prescribed wheelchair and
cane. R. 29, 253.

At the hearing, Venable testified that she had "limited ability to use her hands
and fingers," "[could not] lift her arms," "[could not] stand for long periods of time,"
"ha[d] no grip strength," and that her pain was "at an 8 on a 10-point scale in her
legs" even with medication. R. 29, 52–53, 63–65. The ALJ questioned Venable
about the gaps in her treatment; Venable replied that she had no insurance during
those times. R. 29, 53–54. In the opinion denying benefits, the ALJ noted that, by

11

the time of the hearing, Venable was on Medicaid and had not sought "charity or sliding scale medical care." *Id.*

The ALJ concluded that though Venable's impairments could reasonably be expected to cause her alleged symptoms and limitations, Venable's statements about the intensity, persistence, and limiting effects of these symptoms "[were] not entirely consistent with the medical evidence and other evidence in the record." R. 29–30. Specifically, the ALJ underscored Venable's gaps in treatment, including her lack of medication, follow-up appointments, and lab tests. R. 30. The ALJ noted that Venable visited her primary care provider in December 2015, did not return until January 2017, and did not visit again until 10 months after that, when it was apparently noted that "[Venable] had a history of rheumatoid arthritis that had not been treated with anything other than Ibuprofen for the past year." *Id.* The ALJ stated that "[t]he next significant medical evidence [was] from December 2019, two years later," when Venable was hospitalized after complaining of falls and diabetes-related illness. *Id.*; R. 444–45, 451. At a post-hospitalization follow-up appointment, Venable's exam "again indicated tenderness but without reference to specific joints or muscles," and she received Hydrocodone. R. 31, 419. The ALJ concluded with Venable's 2020 treatment record, "the last treatment note in the record," which indicated diagnoses of rheumatoid arthritis and peripheral nerve

disease.  R. 31.  The ALJ concluded that this evidence did not support the "extreme symptoms and limitations" that Venable alleged.  *Id.*

Turning to the October 23, 2018 physical examination by Dr. Larry Bolton, the ALJ noted that at this appointment, Venable complained of diabetes and reported hypertension and rheumatoid arthritis "with severe pain in her arms and hands."  *Id.* As recounted by the ALJ, Dr. Bolton "observed that [Venable] had difficulty walking across the room," and staff had to assist Venable in rolling up her sleeves, pulling her pant legs up and down, taking off and putting on her socks, and moving and tying her shoes, because Venable "had no grip strength."  R. 32, 292–94. Venable also had limited motion in her wrists and swelling in both hands, as well as pain in her elbows, shoulders, and spine.  *Id.*  Dr. Bolton concluded that Venable's hamstrings and quad muscles had "less than 1 out of 5" strength, and Venable's ankles and knees were "tender."  *Id.*  On this basis, Dr. Bolton concluded that Venable was "completely and totally disabled to work" because of "immobility of the hands, fingers, arms, and lower extremities."  R. 293–94.

The ALJ, however, deemed Dr. Bolton's opinion "not persuasive."  R. 32. The ALJ emphasized that at the time of the consultation with Dr. Bolton, it seemed that Venable had not seen a doctor in close to a year and that this period of time coincided with gaps in her treatment.  *Id.*  The ALJ noted that Dr. Bolton "did not express a function-by-function opinion" as to Venable's capacity and that Dr.

13

Bolton's statement about Venable's "complete[]" and "total[]" disability was an issue reserved to the SSA. *Id.* On the other hand, the ALJ found Dr. Thomas G. Amason's assessment to be persuasive. *Id.* (citing Ex. B2A and B4A). Dr. Amason, a non-examining state agency medical consultant, concluded that Venable could work at a light exertional level and climb ramps and stairs, balance, stoop, kneel, crouch, crawl, reach overhead, and move her fingers. R. 32–33, 115–17. Dr. Amason also found that Venable could not climb ladders, ropes, or scaffolds and should "avoid concentrated exposure" to extreme cold, heat, wetness, humidity, and vibration. R. 33, 115–17.

Though the ALJ found "additional limitations and greater postural limitations" than those expressed by Dr. Amason, the ALJ nevertheless determined that Dr. Amason's opinion "[was] supported by a thorough review of the evidence and a detailed explanation." R. 33. Notably, the ALJ stated that though Dr. Amason supported Venable's diagnosis of rheumatoid arthritis, he found that Dr. Bolton's physical examination findings "were questionable in quality and accuracy and were not supported by or consistent with the objective medical evidence." *Id.* According to the ALJ, Dr. Amason "found it likely" that these inconsistencies were the result of Venable's "poor effort" and Dr. Bolton's "lack of careful examination."[9] *Id.*; R. 117–18. Dr. Amason also emphasized the fact that at Venable's examination with

---

[9] For example, Dr. Amason stated that a grade of 1/5 muscle strength as Dr. Bolton reported "would be the equivalent to someone paralyzed from the waist down." *Id.*; R. 117–18.

Dr. Arnold, shortly after her visit with Dr. Bolton, Venable "did not present as significantly physically impaired, suggesting that her overall functioning [was] much greater than exhibited [with Dr. Bolton]." *Id.*; R. 118.   In addition, Dr. Amason noted the gaps in Venable's treatment.  R. 33, 117–18.

Accordingly, the ALJ stated that she accounted for Venable's impairments "by limiting her to light work with significant postural limitations" and "included environmental workplace restrictions" to address Venable's symptoms.  R. 34.  The ALJ also stated that she accounted for Venable's need to change positions from standing to sitting.  *Id.*  After questioning the vocational expert at the hearing,[10] the ALJ concluded, at Step Four, that Venable could not perform any of her past work. *Id.*   At Step Five, the ALJ concluded—also based on the vocational expert's testimony—that a hypothetical person of Venable's age, education, work

---

[10] Specifically, the ALJ instructed the vocational expert:

> If you would assume a hypothetical individual of the claimant's age and education and with the past jobs that you've described.  Further assume an individual limited to light work as defined in the regulations.  The individual can occasionally operate foot controls, would need to change position from standing to sitting for 30 minutes after every 30 minutes of standing or walking, can remain on task while sitting or standing.  The individual can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds.  The individual can occasionally reach overhead, can frequently handle and finger with bilateral upper extremities, should never be exposed to unprotected heights or dangerous machinery, can tolerate occasional exposure to extreme heat, extreme cold, and vibration.  The individual can understand, remember, and carry out simple instructions, and make simple work-related decisions. Can that individual perform any of the past jobs that you've described?

R. 74–75.

experience, and residual functional capacity could perform the jobs of router (approximately 575,000 jobs present nationally, reduced by 50% to account for a sit/stand option) and parking lot attendant (33,000 jobs present nationally).  R. 35; R. 74–75.  The vocational expert also testified that the router role would not require frequent overhead reaching.  R. 76.  The ALJ introduced a second hypothetical with the same facts but limited the hypothetical person to a sedentary exertional role with occasional reaching, handling, and fingering with upper extremities.  R. 77.  The vocational expert answered that there would be one role this hypothetical person could perform: the job of call-out operator, of which there were approximately 3,300 jobs nationally.  *Id.*  In closing, the ALJ stated that Venable could perform other work in the national economy, so Venable was not disabled under the Act.  R. 35.

## V.

Venable argues that the ALJ's decision is not supported by substantial evidence.  *See* doc. 15.  She first asserts that the ALJ improperly discredited the evaluation of Dr. Bolton, who concluded that Venable could not work due to the immobility of her hands, fingers, arms, and lower extremities.  *Id.* at 11, 15–16 (citing Ex. B1F).  Second and relatedly, Venable asserts that the ALJ's failure to include Venable's immobility in her hypotheticals to the vocational expert means that the ALJ could not have relied on the vocational expert's testimony as substantial evidence.  *Id.* at 17.  The court addresses each of these arguments in turn.

16

A.

Venable claims that the ALJ improperly discredited Dr. Bolton's evaluation, which demonstrated that Venable had very limited mobility in her fingers, hands, arms, and lower extremities.  *Id.* at 11, 15–16.  Venable states that the ALJ discredited Dr. Bolton's evaluation due to Venable's gaps in treatment and that this was an inadequate basis for deeming Dr. Bolton unpersuasive.  *See id.* at 16.  To be sure, the ALJ did remark that one reason she found Dr. Bolton unpersuasive was because, at the time of Venable's consultation with Dr. Bolton, it appeared Venable had not seen a doctor in nearly a year.  R. 32.  And if Venable's gaps in treatment had formed the only basis for the ALJ to discredit Dr. Bolton's evaluation, this may well have constituted reversible error.  *See Dawkins v. Bowen*, 848 F.2d 1211, 1213–14 (11th Cir. 1988) (remanding to ALJ for determination of disability without reference to claimant's failure to follow prescribed treatment given that claimant's potential inability to afford treatment could have excused noncompliance).

However, the ALJ did not rely on this factor alone.  The ALJ also noted that Dr. Bolton "did not express a function-by-function opinion" as to Venable's capacity; that Dr. Bolton's statement that Venable was "completely and totally disabled" was an issue left to the SSA; that Dr. Amason took issue with several of Dr. Bolton's findings, including that Venable had "1/5 muscle strength"; and that, at a visit with Dr. Arnold shortly after Venable's visit with Dr. Bolton, Venable "did

not present as significantly physically impaired, suggesting that her overall functioning [was] much greater than exhibited [with Dr. Bolton]." R. 32–33, 118.

Additionally, the SSA regulations state that, for claims filed on or after March 27, 2017, the ALJ should consider supportability, consistency, the medical source's relationship with the claimant, and the medical source's specialization to determine whether a medical source is persuasive. 20 C.F.R. § 404.1520c(c); *Nix*, 2021 WL 3089309, at *6. The most important of these factors are supportability and consistency. 20 C.F.R. § 404.1520(a). In evaluating a medical source's relationship with the claimant, the ALJ is to consider the length of the treatment relationship, the frequency of the examinations, the purpose of the treatment, the extent of the treatment, and whether the medical source actually examined the claimant or only reviewed the claimant's evidence folder. *Id.* § 404.1520c(c)(3).

These regulations apply to Venable's claims, which were filed in 2018, and the ALJ's decision reflects that she considered these factors in determining whether Dr. Bolton and Dr. Amason were persuasive in their evaluations of Venable's physical conditions. For example, the ALJ discussed the ways in which Dr. Bolton's evaluation was neither consistent with a subsequent evaluation by Dr. Arnold nor supported by Dr. Amason's explanation of "1/5 muscle strength." R. 33. The ALJ also discussed the length of Venable's treatment relationship with Dr. Bolton, and especially the gaps therein, as the ALJ could under the regulations. *See* R. 32–33.

And though the ALJ noted that Dr. Amason was a "non-examining" physician, the regulations suggest that the ALJ could properly find Dr. Amason persuasive on the basis of the most important factors: supportability and consistency.  *See* 20 C.F.R. § 404.1520(a).

The court thus finds that substantial evidence supports the ALJ's determination that Dr. Bolton was not persuasive.   Indeed, under the SSA regulations, it was up to the ALJ to determine the persuasiveness of Dr. Bolton's evaluation, which suggested more severe limitations than those evidenced by the other doctors, given the factors the ALJ utilized. The court therefore cannot reverse the ALJ's decision on this ground.

## B.

Venable also argues that the ALJ could not have relied on the vocational expert's testimony because the ALJ did not include Venable's mobility-related limitations in questioning the vocational expert.  Doc. 15 at 17.  Contained within this contention are, effectively, two arguments: (1) that, if the ALJ should have credited Dr. Bolton's conclusions about Venable's immobility, the ALJ improperly omitted this immobility in her questioning; and (2) that the ALJ's decision to discount Venable's testimony about her pain and subjective symptoms, which led her to ignore Venable's immobility in her questioning, was unsupported by substantial evidence.   As to the first argument, the ALJ could have properly

discredited Dr. Bolton's evaluation.  Thus, the ALJ did not have to include the limitations summarized by Dr. Bolton while questioning the vocational expert.

As to the second argument, to rely on a vocational expert's testimony, the ALJ must "pose a hypothetical question which comprises all of the claimant's impairments." *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999).  If the ALJ should have credited Venable's subjective testimony, then it follows that the ALJ should have included limitations related to Venable's alleged immobility to which Venable testified.  *See* doc. 15 at 17.  Thus, the court must evaluate whether the ALJ's decision to discount Venable's subjective testimony about her pain and other symptoms is supported by substantial evidence.

Because Venable testified about her pain and subjective symptoms, her testimony was subject to a three-part test requiring "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain."  *See Wilson*, 284 F.3d at 1225; *Holt*, 921 F.2d at 1223.  And because the evidence in the record showed that Venable had a "medically determinable impairment that could reasonably be expected to produce her symptoms," *see* R. 29, the ALJ was required to assess the intensity and persistence of Venable's symptoms to determine how they limited her

capacity for work.[11]   *See Costigan*, 603 F. App'x at 786 (citing 20 C.F.R.
§ 404.1529(c)(1)).   To discredit Venable's testimony, the ALJ must have
"articulate[d] explicit and adequate reasons"; otherwise, the ALJ was required to
accept Venable's testimony as true.   *See Wilson*, 284 F.3d at 1225.   The court may
not "disturb a clearly articulated credibility finding supported by substantial
evidence."   *See Mitchell v. Comm'r of Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2014).

As noted, the ALJ applied this test and found first that Venable's medically
determinable impairments could reasonably be expected to cause her alleged
symptoms and limitations.   R. 29.   The ALJ then determined that Venable's
statements about the intensity, persistence, and severity of her symptoms were not
consistent with the evidence.   R. 29–30.   Here, the ALJ emphasized throughout her
analysis the "significant gaps" in Venable's treatment.   R. 29–33.   For example, the
ALJ recognized that Venable experienced a history of arthritis, which caused her
pain and swelling, but also that Venable had not seen a rheumatologist for several
years.   R. 30.   Though the ALJ referenced evidence from 2017 and 2019, when
Venable was prescribed treatment but was noted as "healthy appearing, well

---

[11] In reaching this determination, the ALJ was required to review "all of the record," including the
objective medical evidence, Venable's history, and statements by Venable and her doctors, and
the ALJ was able to consider factors like Venable's daily activities; the location, duration,
frequency, and intensity of her pain or other symptoms; the type, dosage, effectiveness, and side
effects of her medication; and treatments other than medication.   *See Costigan*, 603 F. App'x at
786 (citing 20 C.F.R. § 404.1529(c)(1)).   In addition, the ALJ was required to examine Venable's
symptom-related testimony in relation to all of the other evidence, considering whether there were
"inconsistencies or conflicts between those statements and the record."   *Id.*

nourished, well developed, in no acute distress," and "ambulating normally," the ALJ again returned to Venable's lack of follow-up visits and treatment. R. 30–33. While summarizing her findings, the ALJ concluded that Venable received treatment for her arthritis and had a history of diabetes but that she failed to follow up with her doctors and treatment. R. 31. To be sure, the ALJ seems to challenge Venable's contention that she failed to seek treatment because she had no insurance by pointing out that Venable had Medicaid by the time of the hearing and yet still had not "sought charity or sliding scale medical care or any medical intervention." *Id.* Perhaps because of this failure to seek charity medical care or because of the overall gaps in treatment, the ALJ did not view Venable's testimony as aligned with the evidence and chose to account for Venable's impairments through her residual functional capacity. R. 34.

The record is not clear, however, on this point. Given the ALJ's continuous reliance on Venable's gaps in treatment as the primary reason for discrediting Venable's extensive testimony about her pain and subjective symptoms, *see* R. 29–33, and because the record here does not state when Venable became eligible for Medicaid and thus free or reduced medical care, the court finds that the ALJ's decision to discredit Venable's testimony was not predicated on an "adequate" reason.[12]

---

[12] *See Dawkins*, 848 F.2d at 1214; *cf. Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) ("This case is distinguishable from *Dawkins* because, unlike in *Dawkins*, the ALJ's determination

In particular, the ALJ should have made clear whether she determined that Venable was in fact unable to afford her medical visits and treatment before giving so much weight to the gaps in treatment in the decision to discredit Venable's testimony and deny her benefits. *See Dawkins*, 848 F.2d at 1214. At the hearing, when the ALJ asked Venable about her gaps in treatment, Venable replied that "she had no insurance" and was simply "suffering" between medical visits. R. 29, 53–54. The hearing transcript and the written decision do not reflect further analysis of Venable's purportedly voluntary noncompliance with treatment beyond the statement that Venable apparently did not seek charity or sliding-scale care even when she became eligible for Medicaid. *See* R. 29. And the record does not show when she attained eligibility, to perhaps show that the alleged poverty played no role in Venable's failure to obtain treatment. Moreover, when the ALJ included just *some* limitations on mobility while questioning the vocational expert, the number of roles in the national economy dropped to just one—call-out operator—with 3,300 jobs present nationwide. R. 77. This suggests that the decision to discredit Venable's testimony and consequently omit mobility-related limitations played a significant role in the determination that Venable was not disabled. The ALJ's decision is thus due to be reversed and the case remanded for consideration of

---

that Ellison was not disabled was not significantly based on a finding of noncompliance."); *Brown v. Comm'r of Soc. Sec.*, 425 F. App'x 813, 817 (11th Cir. 2011) ("Because the gap in medical treatment did not play a major role in the ALJ's decision, any error in considering that gap in treatment was harmless.").

Venable's purported inability to afford treatment during the gaps in treatment on which the ALJ heavily relied in discounting Venable's testimony.  *See Dawkins*, 848 F.2d at 1214.

## VI.

As explained above, the court reverses the ALJ's decision and remands the case to the SSA because the ALJ's decision, to the extent it heavily relied on Venable's gaps in treatment to discredit her testimony, is not supported by substantial evidence.  *See Dawkins*, 848 F.2d at 1214.  On remand, the ALJ may find that other evidence in the record justifies the discrediting of and departure from Venable's testimony and/or that Venable's eligibility for Medicaid undermines her contention that she failed to seek treatment because she lacked medical insurance. Regardless, the burden continues to fall on the SSA to produce evidence concerning Venable's unjustified noncompliance with her treatment to the extent this continues to play a role in the ALJ's disability determination.  *Id.*  The court will enter a separate order in accordance with this opinion.

**DONE** the 20th day of October, 2021.

ABDUL K. KALLON
UNITED STATES DISTRICT JUDGE